Paul Harris Furniture Company; Helen B. Wyatt and William Wyatt, Doing Business Under Name and Style of Hotel Byers; Singer Sewing Machine Company, Plaintiffs-Appellees-Cross-Appellants, v. William Morse, and L. M. Neff, Doing Business Under Name and Style of Automatic Heat Company et al., Defendants; A. J. Walker, Doing Business Under Name and Style of The Walker Construction Company, Defendant-Cross-Appellee; The McNamar Boiler & Tank Company, and General Tank Company, Inc., Defendants-Appellants-Cross-Appellees.

**Gen. No. 9,986.**

Third District.

October 19, 1955.

Rehearing denied November 28, 1955.

Released for publication November 28, 1955.

LeForgee, Samuels & Miller, of Decatur, for defendants-appellants McNamar Boiler & Tank Company and General Tank Company, Inc.; Carl R. Miller, and Jerald E. Jackson, both of Decatur, of counsel.

Harry I. Hannah, and John J. Yelvington, both of Mattoon, for plaintiffs-appellees-cross-appellants; Jos. P. Smith, Jr., of Mattoon, of counsel.

Earl S. Hodges, of Springfield, for defendant-cross-appellee A. J. Walker; Samuel C. Patton, of Springfield, of counsel.

MR. PRESIDING JUSTICE HIBBS delivered the opinion of the court.

The parties bring to this court appeals and cross-appeals from judgments entered in three suits consolidated for trial involving extensive damages to the properties of the plaintiffs resulting from an explosion and fire due to escaping propane gas from an underground propane gas tank located on the rear portion of property owned by the City Drug Store in the city of Mattoon, Coles County, Illinois.

The plaintiffs-appellees and also cross-appellants here are Paul Harris Furniture Company, a corpora-

tion, Helen B. Wyatt and William Wyatt, doing business under the name and style of Hotel Byers, and Singer Sewing Machine Company, a corporation, hereinafter referred to respectively as Harris Furniture Company, Hotel Byers and Singer. The defendants were the same in each of the three causes, some of whom are also cross-appellants, and are respectively William Morse and L. M. Neff, doing business under the name and style of Automatic Heat Company, Acme Gas, Inc., a corporation, A. J. Walker, doing business under the name and style of The Walker Construction Company, The McNamar Boiler and Tank Company, a corporation, and General Tank Company, Inc., a corporation, hereinafter referred to respectively as Automatic Heat Company, Acme, Walker, McNamar Boiler and General Tank.

McNamar Boiler was the manufacturer of the propane gas tank here involved. General Tank was its sales agency, and the two corporations had an interlocking board of directors with the same individual as president of each corporation.

At the close of plaintiffs' case William Morse and L. M. Neff, doing business as Automatic Heat Company, original defendants, were dismissed on motion for directed verdict. Acme made a settlement with plaintiffs prior to trial, took a covenant not to sue, and was dismissed without prejudice. Under the covenant not to sue Harris Furniture Company received the sum of $8,940.34, Hotel Byers the sum of $18,391.61 and Singer the sum of $1,611.47.

No questions are raised on these appeals involving either the complaints or answers of the respective parties.

In order to fully comprehend the issues before this court we deem it essential that a statement of facts be made before setting out the judgments of the trial court and the various questions raised by the appeals and cross-appeals.

456

The essential facts in this case are not in substantial dispute. Broadway, an east and west avenue, is one of the principal streets in the business section of the city of Mattoon. It is intersected at right angles by 16th Street, which runs north and south. One block to the east it is intersected by 15th Street and one block to the west by 17th Street. One-half block south of Broadway Avenue is an alley running east and west between 15th and 17th Streets. At the southeast corner of Broadway and 16th Street is a shoe store and next to it to the east is the City Drug Store, which occupies all the lot on which it is located, except a small strip of vacant property at the rear between the store and the alley. Across the alley to the south and at the southeast corner of 16th Street and such alley was a building occupied by the Central Illinois Public Service Company, three or four stories in height with downspouts from the eaves which connected directly with a twelve-inch sewer extending east and west about seven feet under the surface of the alley. The fall of the sewer is east from the manhole in the alley at 16th Street and towards the west from that point to 17th Street. The plaintiff Harris Furniture Company had a store on the south side of Broadway Avenue almost halfway between 16th and 17th Streets and extended to the alley. Plaintiff Byers Hotel had a four-story building at the southeast corner of Broadway and 17th Street which in part extended to the alley. The lobby thereof was at 1619 Broadway and the upper three stories of the hotel were over Nos. 1615, 1617, 1621 and 1623. Singer occupied the first floor of 1615 Broadway between Harris Furniture and Hotel Byers. The sewer in the alley between 16th Street and 17th Street is connected by laterals to the basements of all of the plaintiffs' buildings.

City Drug Store in October 1951 contracted with Morse of Automatic Heat Company for the installation of certain gas heaters for the consumption of either

457

natural or propane gas. The source of the propane gas was to be a 500-gallon tank to be placed in an excavation back of the drugstore in the small vacant tract next to the alley. The cost of installing the tank was not included in the contract of the Automatic Heat Company.

Automatic Heat Company ordered the tank of Acme sometime in September 1951, but did not specify a particular brand of tank or the manufacturer. At that time the tank here involved was on Acme's storage lot. On August 31, 1951 Acme ordered the tank from General Tank by a purchase order for a 500-gallon underground propane tank without specifying any dimensions or characteristics. On September 4, 1951 tank E 6054, being the one thereafter installed for City Drug Store, was received by Acme. The invoice covering the tank was received on September 6, 1951 and the Data Sheet hereafter referred to was received between September 7th and 9th. The Data Sheet was a form required by the American Society of Mechanical Engineers Code, usually referred to as the A.S.M.E. Code. The rules and regulations of the State Fire Marshal required that tanks of this character be made in accordance with that code. The purpose of the Data Sheet was to show that the manufacturer of the tank described therein had complied with such code. On the Data Sheet covering the tank in question was a certificate signed by McNamar Boiler which stated: "We certify the above data to be correct and that all details of materials, construction and workmanship on this unfired pressure vessel conform to the A.S.M.E. Code for Unfired Pressured Vessels." On the Data Sheet was this item: "18. Drain connection . . . . . . . (size) in," and the size of the drain connection was not filled in. The tank weighed about 1600 pounds, had four short legs attached to the sides or bottom, and it had an opening or drain connection in the bottom three-

fourths of an inch in size constructed for the installation of a plug with screw threads on it. This tank had been manufactured by McNamar Boiler, and before being sold by General Tank, was according to the practice of the manufacturer subjected to the hydrostatic test. The plugs were first prepared with a compound or coating of a heavy, paint-like material, the color of which varies. Sometimes it is black, sometimes dark brown and sometimes red. The purpose of the compound is to prevent water from leaking out of the tank during the test. The tank is then filled with water by high-pressure hoses until the pressure reaches four hundred pounds. The inspectors then go around the tank and inspect each welded seam and each opening that had been welded into the tank, looking for small seepages and leaks of any kind.

When the Data Sheet was received by Acme, an employee took it over across the highway where the tank was stored on a storage lot standing flat on the ground with forty or fifty other tanks. A representative of Acme saw two openings in the top of the tank in question, both described in the Data Sheet, but failed to see the drain connection in the bottom. The tank remained in Acme's lot from the day it was received on September 4, 1951 until it was removed on the 26th or 27th day of the following November.

On November 25, 1951 Morse of Automatic Heat Company requested Walker to dig the excavation back of the City Drug Store for the installation underground of the tank. Walker knew that the excavation was made for the installation of a propane gas tank. His employees in making such excavation cut through at least two tile about three feet underground that ran into the sewer. This fact was known to Walker, but he did not stop the outlets and failed to advise Automatic Heat Company or Acme or City Drug Store or anybody else of such fact. Acme neglected to give the tank a

459

protective coating before inserting it in the ground, although such coating is required by the National Board of Fire Underwriters. The tank was removed from the Acme lot on November 26th or 27th, 1951 by Acme and was taken over to the excavation at the City Drug Store and lowered into the ground. After the tank was installed, Walker, through his employees, backfilled the excavation and placed a concrete protective housing over the dome of the tank.

Acme, on the 24th day of January 1952, placed 425 gallons of propane gas in the tank. On Sunday, the 27th day of January, 1952, a substance which the witnesses assumed was steam was seen to come out of the ground in the vicinity of the tank, and then suddenly there was a flash of light and fire behind the City Drug Store and along the sides and out of the downspouts of the Central Illinois Public Service Company building. Shortly after, viz., about ten or fifteen minutes, there were violent explosions in the Harris Furniture Company store and the Byers Hotel and then these buildings caught fire. Most of the hotel windows were blown out. In the basement the metal attachments to the toilet and lavatory facilities were melted. A portion of the concrete first floor was dropped into the basement. Doors were blown off the hinges and walls and partitions were moved and extensive damage was done on all floors throughout the hotel. In the Harris Furniture Company store the merchandise was blown about and misplaced, furniture was burned and smoke-damaged, pictures destroyed and windows blown out. In the Singer Sewing Machine store the damage arose chiefly from falling debris and heat.

On Tuesday, January 29, 1952, the tank was removed from the pit by Acme. It was found that there was no plug in the bottom outlet and Edward McLean, called as an expert, and who was present at the time of the removal of the tank, testified concerning the drain

460

opening that "inside the tank opening on the threads of the coupling there was paint or something."

It is unnecessary to set out in detail the undenied expert proof in this case that these explosions and fires were caused by escaping gas from the tank which eventually flowed into the sewer, and so far as the plaintiffs are concerned, came in contact with an electric motor operating in the basement of one of the buildings, and a gas pilot light and a burning fire in one of the other buildings.

It is worthy to note that the witness, Donald Jackson, who during the time here involved worked for Acme as a bookkeeper, testified that with every shipment of above-ground tanks from McNamar there was always a box of plugs, generally in the dome of one tank, and such plugs were put in the storage room and remained in a box while the tanks were in the storage lot. He also testified that after the explosion and during the taking of an inventory a three-quarter inch plug was found in the Acme storage room.

In the trial of the case proof of damages was made pursuant to a stipulation entered into by all of the parties, whereby the defendants reserved all question of liability, and particularly as a means of saving time, stipulated that the laying of foundation for proof of damages was waived and consented to raise no question about the usage of the schedules or summary of damages which the plaintiffs had prepared, and agreed to waive the introduction of the original books and original vouchers and supporting invoices and not to question that the plaintiffs had paid out or become liable to pay out the items of damages reflected in the schedules, provided the plaintiffs support those schedules by at least one witness per schedule or one witness per plaintiff, and to offer no evidence regarding damages in addition to the items of damages reflected upon the schedules; that the schedules be offered in evidence

461

and constitute documentary proof. Checks, invoices and other separate and numbered items not required by the defendants, it being understood that the defendants reserved the right to cross-examine if they should see fit, and defendants reserved all question with reference to the proper measure of damages.

Pursuant to the stipulation Harris Furniture Company scheduled a total loss of $67,992.19, gave credit for the amount received from Acme of $8,940.34, leaving an uncompensated loss of $59,051.85. Hotel Byers' loss as per schedule was the sum of $111,394.18, and after giving credit for the amount paid to it by Acme under the covenant not to sue of $18,391.61, left an uncompensated loss of $93,002.57. The schedule of Singer showed a total loss of $8,122.85, a credit for the amount received from Acme under the covenant not to sue, viz., $1,611.47, leaving an uncompensated loss of $6,511.38. The jury returned the following verdicts against all defendants remaining in the cause: Harris Furniture Company, $8,940.34, Hotel Byers, $18,391.61 and Singer, $1,611.47, being the identical amounts which the respective plaintiffs received from Acme under the covenant not to sue.

Thereafter McNamar and General Tank and Walker made motions for judgment notwithstanding the verdict, and plaintiff Harris Furniture Company moved the court to enter judgment in its favor against all of the defendants in the amount of $59,051.85 and costs and in the alternative moved that in the event said motion for judgment notwithstanding the verdict be denied that the verdict upon the question of the liability of the defendants be sustained and judgment be entered thereon upon the question of liability only and plaintiff be granted a new trial upon the sole issue of the amount of damages. Hotel Byers made like motions, but requested the court to enter judgment in its favor against the defendants in the amount of

$93,002.57 and costs and a like motion in the alternative for a new trial only on the sole issue of the amount of the damages. Singer made a like motion for judgment notwithstanding the verdict but in the amount of $6,511.38 and costs and a like motion in the alternative for a new trial only on the issue of the amount of the damages. The motion of McNamar Boiler and General Tank for judgment notwithstanding the verdict was denied. The motion of Walker for judgment notwithstanding the verdict was granted. The respective motions of the plaintiffs, namely, Harris Furniture Company, Hotel Byers and Singer were denied. Judgment was entered on the verdicts of the jury in favor of Harris Furniture Company against the defendants, McNamar Boiler and General Tank, in the sum of $8,940.34, in favor of Byers Hotel against said defendants in the sum of $18,391.61, and in favor of Singer against said defendants in the sum of $1,611.47.

The appeals and cross-appeals bring to this court for review all of the post-verdict motions and rulings by the trial court above set forth.

We are faced first with the question of the liability of defendants, McNamar Boiler and General Tank, the manufacturer of the tank in question and its sales agency, who purchased it from McNamar and sold it to Acme. Plaintiffs contend the tank in question was shipped by McNamar without a plug in its bottom drain hole, that this was a negligent act on its part, which permitted the propane gas to escape after its subsequent installation and was a proximate cause of the damages complained of here. McNamar and General Tank contend that throughout the trial of this case, and on appeal here, plaintiffs have merely assumed that there was no plug in the drain hole when it left the possession of McNamar Boiler and General Tank and that no plug was furnished for it. They further say there is no proof in the record supporting such charges.

463

The tank in question was sold by McNamar Boiler to General Tank on June 23, 1951 and was shipped from Tulsa, Oklahoma to the latter company at St. Louis, Missouri. Thereafter it was sold to Acme and delivered to it at Mattoon, Illinois by truck on September 4, 1951. The tank was unloaded on a storage lot opposite Acme's office and remained there with other tanks until it was delivered to the excavation prepared for it behind the City Drug Store on or about November 26, 1951. The proofs show that sometimes the plugs were forwarded not in the respective holes in the tank but in a box in the dome of one of the tanks. Carroll J. Creager, manager of Acme, testified that he checked the tank shortly after its arrival in Mattoon. Regulations of the State Fire Marshal required that the tank be coated with coal tar or asphalt by the installer, but it appears that this was not done. Moreover, Creager admitted that the tank was not examined to see if its bottom drain opening was plugged. Donald Jackson, an employee of Acme at the time of the occurrences in question, testified that a plug of the size required to fit the drain opening of the tank in question was found much later at Acme.

██ It is clear that innumerable opportunities existed for the plug to have been lost or removed from the tank's opening, if it had been in the opening, or from a box in the dome of the tank, from the time it left Tulsa and St. Louis until it was taken from the storage lot on or about November 26th. It had been standing there since September 4, 1951. Under these circumstances the fact that there was no plug in the opening at the time it was removed from the excavation on January 29, 1952 is no proof that it was never there or that it never was furnished by McNamar Boiler and General Tank.

In Rotche v. Buick Motor Co., 358 Ill. 507, Rotche purchased a Buick automobile from the Cicero Sales

Company. Twenty-six days later, while returning home from a trip, plaintiff applied his foot brake and the car turned to the right, struck a culvert, plunged through a ditch about twelve feet deep and landed in a plowed field. Besides the damage to the automobile the plaintiff was injured. An examination of the automobile disclosed that a clevis and two cotter pins, a part of the braking mechanism, were missing and possibly a cotter pin was unspread. At page 516 the court say: "The mere fact that an accident resulting in an injury to a person or in damage to property has occurred does not authorize a presumption or inference that the defendant was negligent. The burden was upon the defendant in error to prove by competent evidence, direct or circumstantial, that the plaintiff in error was guilty of negligence in the manufacture or assemblage of the automobile in question. (Citation.) Testimony concerning the condition of cotter pins in the brake mechanism several weeks after the accident occurred without proof that the condition of the pins remained unchanged was inadmissible and should have been excluded. Such testimony was not responsive to the allegations of the declaration and could not subject the plaintiff in error to liability. (Citations).

"Two witnesses called by the defendant in error stated generally that the automobile was in the same condition when they examined it in Chicago as when they saw it in the field immediately after the accident. In the field they saw the cable detached, but neither testified that he saw an unspread cotter pin or that such a pin was missing. No other witness saw the automobile immediately after the accident. The garages in Des Plaines and Chicago to which the wrecked automobile was successively removed were public and accessible to any person who might wish to enter them. The car was not kept in either garage under the observation or protection of any person. Ample opportunity

was afforded after the accident and before any witness took particular notice of the car to tamper with the cotter pins. These pins were made of soft metal and without exerting effort or skill could be removed or straightened in a few moments. Without a proper foundation being laid for the evidence, the condition in which the car was found several weeks after the accident had no tendency to show how the parts had been assembled at the factory. Such proof even failed to establish the condition of the car when the accident occurred." The plaintiff's judgment was reversed and the cause remanded.

In this case the tank in question with other tanks was in a storage lot across the street from Acme's office from September 4, 1951 until November 26th of that year. There was ample opportunity for strangers and unauthorized persons to remove the plug from the tank, or in the event it was in a box in the dome of the tank, or in the dome of some of the other tanks there stored, to take and remove such plug or plugs.

Plaintiffs also rely on the testimony of Edward McLean, who examined the tank immediately after it was removed from the ground. He stated that "inside the tank opening on the threads of the coupling there was paint or something." Plaintiffs urge that this paint was the original paint applied by McNamar Boiler and argue that this is further proof that no plug was ever in the opening after it was painted. Assuming that the substance in question was the original paint applied by McNamar Boiler we find no proof that inserting a plug would have damaged the paint in the opening, and if it would have done so, that the paint in the opening was damaged. McLean's testimony can also be interpreted to mean that a substance other than paint was found in the opening. In this connection it is significant that James Jackson, president of both McNamar Boiler and General Tank, testified "that be-

466

fore shipment, a test plug is coated with a sealing compound and inserted in the drain hole and the tank filled with water under pressure." Robert Robinson, an employee of Acme, also testified that it was customary there to remove all plugs and coat them with a sealing compound when preparing tanks for installation. The substance referred to by McLean could therefore have been a residue of this compound. If so, there is another hiatus in the proof. If the substance was left after the test plug was removed by McNamar Boiler, there is no proof as to whether insertion of another plug and its subsequent removal would have destroyed that residue. The same question is presented if we assume that a plug coated with sealer compound was inserted by Acme and later lost or removed. We do not believe the proof that "paint or something" was in the opening at the time the tank was removed from the ground, without further proof explaining its significance is sufficient evidence compelling the inference that no plug was in the opening when the tank left Tulsa, or from St. Louis when it was shipped to Acme, or was not otherwise supplied to Acme.

Plaintiffs rely strongly on an alleged omission in the Data Report issued by McNamar Boiler concerning this tank. Under the regulations of the State Fire Marshal's office one copy of the report was required to be filed in that office and another sent to Acme. These reports give the specifications of the tank and are in general form with blank spaces which must be filled in describing a particular tank. In the Data Report issued concerning the tank here there appeared the following: "18. Drain connection . . . . (size) in," which was not answered. Plaintiffs contend that this amounted to a representation by McNamar Boiler that the tank in question had no bottom drain opening. In this connection it should be pointed out that Frank J. Kressberger, Asst. State Fire Marshal, in whose

office one copy of the report was filed testified: "With reference to the tank, item No. 18 indicates to me that the drain outlet will not be used on this tank for a liquid take-off line. From the report I'd assume there was a drain outlet on the tank. The fact that the size is not filled in indicates that it is not going to be used."

Also, as evidence of the reliance placed by Acme upon these reports, at least in some instances, the testimony of Donald Jackson, a former employee of Acme, is illuminating. He stated that "on some occasions we would receive data reports as much as two and three weeks after we had received the tanks. Sometimes the tanks had already been installed by that time."

██ In any event any omission on this report is not evidence that the tank was shipped out by McNamar Boiler without a plug in its bottom drain hole or in a box in the dome of the tank. This, in our opinion, is a decisive issue as far as McNamar Boiler's liability is concerned. The burden of proving that McNamar Boiler and its sales agency, General Tank, were guilty of negligence rested upon the plaintiffs. This burden can be sustained by circumstantial evidence, but it is not sufficient to prove a mere possibility.

█ In Celner v. Prather, 301 Ill. App. 224, the court said at page 227: "Proof of a mere possibility is not sufficient. A theory cannot be said to be established by circumstantial evidence, unless the facts are of such a nature and so related, as to make it the only conclusion that could reasonably be drawn. It cannot be said one fact can be inferred, when the existence of another inconsistent fact can be drawn with equal certainty." In Coulson v. Discerns, 329 Ill. App. 28 at page 32 the court say: "A fact cannot be established by circumstantial evidence unless the circumstances are of a nature and so related to each other that it is the only conclusion that can be drawn therefrom, and mere conjecture, guess or suspicion is insufficient." To the same effect is Ohio Bldg. Safety Vault Co. v. Industrial Board, 277

Ill. 96 and O'Connor v. Aluminum Ore Co., 224 Ill. App. 613.

█ We believe that plaintiffs have failed to produce evidence which required the court to submit the issue to the jury and therefore erred in overruling the motion for judgment notwithstanding the verdict presented by McNamar Boiler and General Tank.

█ We come now to the plaintiffs' appeal from the order of the circuit court sustaining a motion filed by Walker for judgment notwithstanding the verdict. The sole issue before the court on that motion was whether, considering all the evidence and the inferences that could be reasonably drawn from it most favorable to the plaintiffs, there was a total failure to prove any necessary element of plaintiffs' case against that defendant. (Heideman v. Kelsey, 414 Ill. 453.) On this appeal we can only determine whether the circuit court was justified in finding as a matter of law that the plaintiffs totally failed to prove any negligence by Walker, as charged. He was employed by Automatic Heat Company to excavate a pit for the propane gas tank described above. One of his employees who did the actual digging cut two string of tile lying about three feet beneath the surface behind the City Drug Store and extending from that store towards the sewer in the alley. Walker testified that he knew a tank for the storage of propane gas was to be installed in the excavation. He also testified that he knew the tile had been cut and inspected the site thereafter, but that he did not notify Automatic Heat Company, City Drug Store, Acme or anyone else that the tile had been severed. Subsequently after Acme had installed the tank, he backfilled the excavation and placed a concrete platform over it. Plaintiffs contend that this was sufficient proof to warrant the jury finding Walker guilty of negligence which was a proximate cause of plaintiffs' damages.

469

 It is a general rule that an independent contractor whose work has been accepted by his employer is not liable to third persons for injuries received as a result of defective construction or installation. (Empire Laundry Machinery Co. v. Brady, 164 Ill. 58.) There are many exceptions to this rule, however, and these are summarized in Healey v. Heidel, 210 Ill. App. 387. One such exception was there stated at page 391 to exist where "the thing dealt with is imminently dangerous in kind, such as poisonous drugs incorrectly labeled, dangerous chemicals, unwholesome food, a defective gun, explosives, and the like." We believe that a tank for the storage of propane gas comes within this exception, and that Walker therefore had a duty to properly make the excavation and to advise Automatic Heat Company, City Drug Store and Acme that he had severed the two drain tile leading from the drugstore towards the sewer in the alley.

 There is ample proof in the record to support plaintiffs' theory that propane gas escaped from the open drain hole in the storage tank and eventually passed through the severed tile to the sewer behind City Drug Store and in that sewer to the various properties of plaintiffs where it exploded and caught fire.

We also believe that the evidence in the record is sufficient to support the jury's conclusion that Walker's failure to repair or replace the severed tile, or at least to notify his employer, City Drug Store or Acme of the severance of the tile, amounted to negligence on his part. While he might not have foreseen the catastrophe that occurred as a result, in part, of his acts, we believe that he should have foreseen that injury or damage of some sort would occur. (City of Dixon v. Scott, 181 Ill. 116.) The jury undoubtedly decided that he should have anticipated that circumstances could arise whereby the propane gas stored in the tank on the premises in question might leak therefrom, and the tile which

had been severed would provide a route whereby the gas could escape from the premises and cause damages. In our opinion this determination is supported by the evidence.

■ We also feel that a jury could properly find that Walker's negligence was a proximate cause of plaintiffs' damages. He was a part of the joint effort of several firms to install a propane gas heating system for the City Drug Store. Even though the negligence of others may have contributed to the damage that resulted Walker is liable for his own negligence, if it contributed substantially to that result. (Consolidated Ice Mach. Co. v. Keifer, 134 Ill. 481.) The case of Merlo v. Public Service Co. of Northern Illinois, 381 Ill. 300 cited by Walker is not in point. There W.P.A. workmen engaged in constructing a sewer were electrocuted when the tip of a boom of a crane came into contact with the overhead wires of an electric company, while they were holding the crane's metal cables. The Supreme Court there held that the electric company's failure to properly insulate its wires created only a condition making the injury possible and was not its proximate cause. The electric company was not participating in the construction of the sewer and contributed nothing toward the final result. The cases of Seith v. Commonwealth Elec. Co., 241 Ill. 252, Illinois Cent. R. Co. v. Oswald, 338 Ill. 270, Briske v. Village of Burnham, 379 Ill. 193, and Storen v. City of Chicago, 373 Ill. 530 can all be distinguished for similar reasons.

We conclude that the verdict of the jury finding Walker guilty of negligence can be supported by the proof in this case and therefore agree with plaintiffs' contention that the circuit court erred in sustaining Walker's motion for judgment notwithstanding the verdict.

There remains only the question presented by plaintiffs' cross-appeal from the order of the circuit court

471

denying their motions for judgments notwithstanding the verdicts and in the alternative their motions for a new trial on the sole question of the amount of damages. These motions sought to induce the court to enter judgment in the amounts proved by plaintiffs pursuant to a stipulation of all the parties instead of the smaller amounts returned by the jury, or in the alternative to order a new trial on the sole issue of the amount of damages. Plaintiffs claim that the stipulation as to the manner of proof of damages and the proofs submitted thereunder conclusively settle the amount thereof. With this contention we cannot agree. The stipulation related solely to the manner of proof and not to the amount of damages. In addition the defendants reserved the right to cross-examine the witnesses on the question of damages and reserved all questions with reference to the liability and to the measure of damages. In line with such stipulation each of the witnesses for plaintiffs on the amount of the damages was extensively cross-examined and objections made in some instances that the proper measure of damages had not been applied.

These were tort actions in which the question of liability was one of the principal disputed issues. The amount of damages were unliquidated, and serious questions were presented whether plaintiffs had applied in their proofs the proper measure of damages. The determination as to the amount of damages in such cases is peculiarly a function of the jury. It has a right to pass upon the credibility of the witnesses and view their testimony in the light of their common observation and experience as men and women in the ordinary affairs of life.

We believe if the judgments as prayed for in their respective motions were entered there would be in the language of Hughes v. Bandy, 404 Ill. 74 at page 80: "A wrongful exercise of judicial power and authority

472

which, in effect, deprived the defendant of a right of trial by jury."

In Hughes v. Bandy, 336 Ill. App. 472 this court held that where there is evidence which standing alone tends to prove material allegations of a complaint or answer a motion for judgment notwithstanding a verdict should be denied even if there is a preponderance of all of the evidence in favor of the person filing the motion. We further held that this was true even though the only relief sought by the motion was judgment for a stipulated amount of damages which was greatly in excess of the amount returned by the jury. This decision was affirmed by the Supreme Court in Hughes v. Bandy, supra. We believe this decision applicable here. There was sufficient evidence in the record in support of plaintiffs' complaints to compel the submission of the issue of Walker's liability to the jury. Plaintiffs therefore cannot attack the verdict by a motion for judgment notwithstanding even if the attack is confined to the amount of damages allowed and that amount was stipulated as plaintiffs assume. (McCaskill v. Quintano, 350 Ill. App. 374.)

We noted in the Bandy case that the verdict there was obviously a compromise verdict and suggested at page 479 that it "should not have been permitted to stand if the plaintiff had made a motion for a new trial. Instead of making an alternative motion for a new trial the plaintiff made only a motion for judgment notwithstanding the verdict. Here plaintiffs did make an alternative motion but only for a new trial on the sole question of damages. Plaintiffs have cited no statutory authority authorizing a trial court to so limit the scope of a new trial, if granted. They cite Section 92(e) of the Civil Practice Act, Ill. Rev. Stat. 1953, Chap. 110, Par. 216e [Jones Ill. Stats. Ann. 104.092, subd. (e)], which authorizes partial reversal by a reviewing court and Section 68b, Ill. Rev. Stat.

1953, Chap. 110, Par. 192b [Jones Ill. Stats. Ann. 104.068, subd. (b)], which provides for partial remandment by the reviewing court for the purpose of assessing damages in the trial court and argue by analogy that a trial court should be permitted to grant the same relief, if timely asked for. If such power exists in a trial court, it is clear that it is limited in scope. The Supreme Court of the United States has held that such power should not be exercised "unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." (Gasoline Products Co. v. Champlin Refining Co., 283 U. S. 494, 75 L. Ed. 1188; 98 A. L. R. 941 for collection of cases; and Bristow "Verdicts" 40 Ill. Bar Journal 319, 321.) While it is arguable that the issue of damages is distinct from that of liability in this case because of the stipulation entered into by all the parties, there is still a further restriction. When the size of the verdict indicates that it was a result of a compromise, it is held generally that the entire verdict is tainted and a new trial should be ordered on all issues. (See 98 A. L. R. 944 for collected cases.) We believe this to be a sound rule. In Simmons v. Fish, 210 Mass. 563, 97 N. E. 102 the court said: "A verdict which is the result of real harmony of thought growing out of open-minded discussion between jurors with a willingness to be convinced, with a proper regard for opinions of others and with a reasonable distrust of individual views not shared by their fellows and of fair yielding of one reason to a stronger one, each having in mind the great desirability of unanimity both for the parties and for the public, is not open to criticism. But a verdict which is reached only by the surrender of conscientious convictions upon one material issue by some jurors in return for a relinquishment by others of their like settled opinion upon another issue and the result is one which does not com-

474

mand the approval of the whole panel, is a compromise verdict, founded upon conduct subversive of the soundness of trial by jury." It is clear that the verdict here was a result of a compromise. The amount awarded each plaintiff bears no relation to the damages but is exactly the same as the amount paid in each instance by Acme under its covenant not to sue.

As was said in the Simmons case, supra: ". . . it would be a gross injustice to set aside such a verdict as to damages alone against the protest of a defendant, and force him to a new trial with the issue of liability closed against him when it is obvious that no jury had ever decided that issue against him on justifiable grounds." While it is true that we have held here that the jury's verdict against Walker was not subject to challenge on the question of liability because there was evidence to support it, this does not mean that a verdict reaching an opposite conclusion might not have been upheld, if similarly attacked.

Because the verdict against Walker was obviously a compromise, if any part of it is vulnerable it should be set aside completely and a new trial had of all the issues involved. Plaintiffs, however, are limited to the relief prayed for by them in their respective motions. Since they moved not for a new trial generally but for a new trial on the question of damages and since such motion cannot properly be granted in this case, the verdict of the jury with respect to Walker must be sustained. The circuit court therefore properly overruled both of plaintiffs' post-trial motions.

In view of our conclusions aforestated, it is not necessary to discuss further the stipulation as to proof of the plaintiffs' damages entered into between the parties, nor whether the proper measure of damages was applied.

The orders of the Circuit Court of Coles County overruling the motion of Paul Harris Furniture Company,

a corporation, Helen B. Wyatt and William Wyatt, doing business under the name and style of Hotel Byers and Singer Sewing Machine Company, a corporation, for judgments notwithstanding the verdicts or in the alternative for a new trial on the question of damages alone is affirmed. The action of that court in overruling the motions of McNamar Boiler and Tank Company, a corporation and General Tank Company, Inc., a corporation, for judgments notwithstanding the verdicts and judgments entered upon such verdicts is hereby reversed. The action of the trial court in sustaining the motion of A. J. Walker, doing business under the name and style of The Walker Construction Company, for judgment notwithstanding the verdict and the judgment entered in accordance thereby is reversed and the court is directed to enter judgments against A. J. Walker, doing business under the name and style of The Walker Construction Company for the amount of plaintiffs' verdicts.

Affirmed in part and reversed in part and remanded with directions.